Robert L. Rouse, Administrator of Estate of Louis A. Rouse, Deceased, Appellee, v. The New York, Chicago and St. Louis Railroad Company, Appellant.

Gen. No. 45,763.

Opinion filed January 21, 1953. Rehearing denied February 4, 1953. Released for publication February 4, 1953.

WINSTON, STRAWN, BLACK & TOWNER, of Chicago, for appellant; DOUGLAS C. MOIR, GEORGE B. CHRISTENSEN, and EDWARD J. WENDROW, all of Chicago, of counsel.

WILLIAM H. DEPARCQ and ROBERT J. MARTINEAU, both of Chicago, for appellee.

MR. JUSTICE FEINBERG delivered the opinion of the court.

Plaintiff brought this action under the Federal Employers' Liability Act for personal injuries allegedly due to defendant's negligence. Upon a trial with a jury a verdict for $47,000 was returned, and after denial of defendant's motion for judgment notwithstanding the verdict or for a new trial, judgment was entered upon the verdict, and defendant appeals.

That the parties come under the Federal Employers' Liability Act is not disputed.

On September 4, 1948, about 1:30 a. m., plaintiff was the engineer on defendant's freight train driven at a speed of approximately 30 miles per hour, in an easterly direction from Donnellson, Illinois, and as the train approached a passing track off the main line, plaintiff observed sparks emanating from under the trucks of the engine tank. He descended to the bottom step of the tank ladder, located on the south side of the engine, adjacent to what is described as the engine gangway. In a squatting position, while hanging onto the grab iron, he looked under the tank to ascertain the cause of the sparks. He testified that in his thirty years of railroading experience it was necessary and customary for engineers to investigate the cause of such sparks while the train was running; that it could have been one of several things that might create a derailment and consequent injury to life or property; and that the only way he could determine the cause of the sparks was to assume the squatting position he did, a few inches above the rail, while the train was in motion. Plaintiff's testimony as to the duty and customary way of investigating the cause of such sparks while the train was running is not disputed. Defendant's witness Swann, an engineer, merely testified that he never got down on the steps of an engine to make an inspection because "I would be afraid to."

While in the squatting position described, the train approached a "dwarf" or "pot" signal, a part of the

142

block system of signals then in operation, which controlled the movement of trains on a parallel passing track. The "dwarf" or "pot" signal was located in the middle of the space between the main and passing tracks, whose centers were approximately 13½ feet apart. The signal was 8 inches wide, extended to a height of 27 inches above the rail, about 4 feet laterally from the south rail of the main line track, and about 17 inches laterally from the step on which plaintiff took his position. The "pot" signal in question at its rear reflected no light or signal to trains traveling from the west in an easterly direction. It was only intended as a signal for the trains approaching from the east. There was evidence for plaintiff that the closest part of the signal to the southerly rail was 46 inches and that the clearance between the side of the engine and the "pot" signal in question was 10¼ inches. Plaintiff, while in the described position, was knocked off the ladder by the "dwarf" or "pot" signal and sustained injuries to his left shoulder. The evidence for defendant tends to show that the clearance met the approved standard and was within the specifications of the American Association of Railroads.

 The negligence charged was the failure of defendant to furnish plaintiff a reasonably safe place or surroundings in which to perform his duties. Whether defendant furnished such a reasonably safe place or surroundings must necessarily be determined by the nature of the duties required of plaintiff and the manner in which such duties are generally and customarily performed by those employed in similar positions. A special interrogatory submitted to the jury was answered in the affirmative that defendant was negligent in the installation and maintenance of the signal in question. If we can say, upon the evidence in the record, that the investigation plaintiff made was within the purview of his duties as an engineer and per-

· 143

formed in a manner not unusual or abnormal, then it is clear that defendant had a duty not to erect the instant ''dwarf'' or ''pot'' signal, if it could become dangerous to the safety of plaintiff in the performance of his duties.

Bearing upon the question as to whether plaintiff's manner of performing his duty was unusual or abnormal and should defeat his right to recover, as argued by defendant, is the case of *Anderson v. Baltimore & O. R. Co.*, 89 F. (2d) 629, 630. There, the fireman on a locomotive engine, while the train was in motion, walked forward at the side of the engine to the sand pipes, for the purpose of tapping them with a pick to get the sand to flow, and while stooping over to look at one of the pipes, he got in the way of an engine of the Erie Railroad coming from the opposite direction around a curve on the adjacent track. He was struck by the pilot beam and instantly killed. The court allowed a recovery and reversed the district court, which had directed a verdict for the defendant.

 That the ''dwarf'' or ''pot'' signal was erected in accordance with the clearance specifications of the American Association of Railroads, and as customarily followed by other railroads in the system of signals for the operation of trains, is not controlling. Such evidence is competent and may have probative value upon the question of negligence, but it is not conclusive. The test is whether there was necessity in the practical operation and movement of defendant's trains to locate the ''dwarf'' or ''pot'' signal at the point in question. As was said in *Texas & P. Ry. Co. v. Behymer*, 189 U. S. 468:

''What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not.''

Reflecting upon the necessity for locating the "dwarf" or "pot" signal in question, for the practical operation of the railroad, is the testimony of defendant's witness Mettlen, the signal supervisor for the defendant. He testified: "I am sure the Interstate Commerce Commission requires all signals on the engineer's side unless you can show some very definite cause for putting them elsewhere. I would say that close clearance between the signal and the main line would be a very definite reason. Physically. there is nothing south of the passing track at Donnellson that would have prevented us from locating the signal there. We could have built it there. It is a question of putting a concrete block down and erecting the signal. * * * I am responsible for the installation of this signal."

Defendant produced an expert witness, a district manager for the company that manufactured the signal in question, who was familiar with the installation and location of such signals. He testified that to comply with the Interstate Commerce Commission regulations, the signal had to be located to the right of the track; that where physical limitations will not permit the installation to the right, by permission of the Commerce Commission it could be installed at the left; and that if by locating the signal on the right, it would not allow sufficient clearance, there are the alternatives either to install it at the left with the permission of the Commerce Commission, or by putting up a bridge structure and mounting the signal on the bridge structure above the rail.

In the light of this testimony, together with all the other facts, we think it was a question for the jury to determine whether the installation of the "dwarf" or "pot" signal at the place in question was dangerous to the safety of plaintiff in the performance of his duty when required to investigate the cause of the sparks

during the movement of his train. It was the jury's province, in view of plaintiff's undisputed testimony that what he did was part of his duty and customarily followed by others in the same position, to determine whether defendant by the exercise of reasonable care could foresee that an emergency might arise, under the circumstances in the instant case, calling upon plaintiff to investigate the cause of sparks, and that the location of the instant ''pot'' signal could become unsafe in the response of plaintiff to such an emergency.

██ Under the uniform holdings in cases arising under the Federal Employers' Liability Act, even if plaintiff in performing such duty was careless or negligent, which contributed to cause the accident, such contributory negligence is not a defense to an action under the Act, but should be considered in mitigation of damages. *Wetherbee v. Elgin, Joliet & Eastern Ry. Co.*, 191 F. (2d) 302 (7th Circuit). Nor does the doctrine of assumption of risk exist since the 1939 amendment to the Act. *Tiller v. Atlantic Coast Line R. Co.*, 318 U. S. 54.

██ We think, on this record, that the court properly submitted to the jury the question of defendant's negligence. As was said in *Tennant v. Peoria & P. U. Ry. Co.*, 321 U. S. 29, 35:

''That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.''

In *Bailey v. Central Vt. Ry. Co.*, 319 U. S. 350, the court said:

'' * * * It is part and parcel of the remedy afforded railroad workers under the Employers' Liability Act.

Reasonable care and cause and effect are as elusive here as in other fields. But the jury has been chosen as the appropriate tribunal to apply those standards to the facts of these personal injuries. That method of determining the liability of the carriers and of placing on them the cost of these industrial accidents may be crude, archaic, and expensive as compared with the more modern systems of workmen's compensation. But however inefficient and backward it may be, it is the system which Congress has provided. To deprive these workers of the benefit of a jury trial in close or doubtful cases is to take away a goodly portion of the relief which Congress has afforded them."

Defendant argues the verdict is grossly excessive. The evidence discloses that up to the time of trial plaintiff lost earnings totalling $18,641.88, which left $28,358.12 of the verdict to cover past and future pain and suffering, loss of future earnings, as well as disability, directly due to his injury.

The evidence for plaintiff is that plaintiff sustained a severe fracture of the left arm; that there is definite limitation of motion of the left arm; that the condition, according to medical opinion, is permanent; and that plaintiff would not be able to perform his former duties of engineer. From the time of the accident to the date of trial, he suffered severe pain in the left shoulder and elbow, a throbbing type of pain that interfered with his sleeping and woke him when he rolled on his left side in his sleep. He was first taken to the Hillsboro Hospital, where his arm was set with weights hanging from the fingers. He was in that position for about three days, when a splint with a cast completely around it was applied. Ten days later he was removed from that hospital by ambulance to St. Vincent's Hospital in Cleveland, Ohio, and came under the treatment of the surgeon for the defendant company. On September 21 his arm was rebroken, reset and wired and then placed

back in the same splint and cast. On September 28 he was discharged from the latter hospital and returned to his home with his arm in the cast. After that he had to hold his arm on a pillow in a fixed position, with the cast off. He continued to have treatments and massage by defendant's doctors until March 1, 1949. X-rays taken November 2, 1951, disclosed that he had a long spicule of bone which developed as a mechanical block when raising the arm. The mechanical blocking interfered with the soft tissues that have to do with the elevation and motion of the arm, which produced a condition that is medically known as "periarthritis," meaning inflammation due to an irritation of inflamed tissues that fuse together, and the soft tissues harden and form adhesions. The medical testimony establishes that the condition is permanent.

An experienced actuary testified that the life expectancy of plaintiff was 16.93 years. At the time of the accident plaintiff's average earnings were $490 per month. At the time of trial he was 57 years of age. That, plus his expectancy years, would make him 73 years old. The jury had before it the age factor and his earning capacity in determining not only his actual damages in the loss of earnings up to the trial, but damages for his loss of earning capacity directly due to the injury involved in the accident. Respecting allowance for pain and suffering, this court said in *Ford v. Friel,* 330 Ill. App. 136, 140:

"In no case will the scales of justice balance, when injuries, pain and suffering are placed upon the one side and monetary compensation upon the other. Her earning capacity has been seriously reduced. Her ability to do the type of work she was accustomed to has been impaired. Defendants have no right to accelerate her inability to work by injury inflicted through their negligence. She is entitled to have her inability to work

148

develop through the normal channel of advancing years.''

In *Howard v. Baltimore & O. C. T. R. Co.,* 327 Ill. App. 83, 103, it was said:

''We have often recognized, in passing upon the amount of damages awarded, the decline in the purchasing power of money.''

In considering whether plaintiff's earning capacity would continue to the expectancy age of 73 years, the jury had evidence before them that at the time of trial defendant had in its employ an engineer named Frank Mittlowach, who was 75 years of age. Defendant's witness Mettlen, whose age was judged to be 74 years, was then working regularly as an engineer, and defendant's engineers, Dores Griffith and Carl Shaver, were stated to be well past 65 years of age at the time of the trial.

In *Zelinski v. Chicago & N. W. Ry. Co.,* 336 Ill. App. 49, this court sustained a verdict for $30,000 under the Federal Employers' Liability Act, where the plaintiff's average earnings were $230 per month, and where the injury consisted of a fracture of the radius in the lower third of the right arm and a fracture of the index finger, a permanent condition that prevented further performance of duty as a laborer.

Defendant contends in connection with its complaint as to the excessiveness of the verdict that the fact plaintiff died pending this appeal, and an administrator was substituted, lends support to the claim of excessiveness, an allowance having been made for the period of the life expectancy. The Supreme Court of Missouri asked a significant question in *Dempsey v. Thompson,* 251 S. W. (2d) 42. It was there said:

''If it were just to abate any damages awarded plaintiff for the period of time he expired before his calculated expectancy, then would not defendant be liable

to plaintiff's representatives for any time he lived beyond that expectancy, had he done so?''

 We think, under the circumstances, the verdict was not so excessive as to imply that it was the result of passion or prejudice.

Complaint is made that the court erred in allowing plaintiff's witness Reise, an actuary, to testify to the present value of gross average monthly earnings based on plaintiff's life expectancy rather than work expectancy, without allowing deduction for taxes, and because his computation was based on an average gross monthly earning of $490.08 without evidence to support it. Defendant relies chiefly on *Wetherbee v. Elgin, Joliet & Eastern Ry. Co., supra.* Seemingly, the cited case supports defendant's contention, but a careful reading of the opinion discloses two factual distinctions: (1) the case cited involved a death case, and the recovery necessarily would be limited to the probable contributions for the support of deceased's dependents rather than his probable gross average earnings during the life expectancy, and (2) the instructions to the jury as well as the evidence of the actuary were not limited to a computation of probable contribution to the dependents.

In *Dempsey v. Thompson, supra,* where the contention was that a computation made by an actuary, based on probable gross earnings without deduction for taxes, is improper, the court had occasion to review a number of State and Federal cases cited on the subject, including *Wetherbee v. Elgin, Joliet & Eastern Ry. Co., supra,* and held:

''The effect of these cases is that, as a matter of necessity, the general rule that an award of damages for loss of future earnings should be based strictly on actual pecuniary loss cannot be rigidly adhered to insofar as it may be impossible to compute with reason-

150

able accuracy the amount of income tax liability that may attach thereto. We think they are soundly ruled and that the trial court did not err either in refusing to permit defendant to cross examine plaintiff's actuarial witness relative to income tax liability, or in refusing to permit defendant to argue to the jury that in arriving at the amount of its award it should consider only the amount of future earnings lost to plaintiff after deduction of income taxes for which he would have been liable had he continued his employment without injury. But it does not follow that defendant was not entitled to have the jury instructed that any amount awarded plaintiff was not subject to Federal or (Arkansas) State income tax.''

 We are persuaded by the reasoning in the *Dempsey* case and cases there cited and hold that the admission of the evidence in question was not reversible error. We find evidence in the record to support the stated amount of plaintiff's average monthly earnings.

Defendant complains of given instruction No. 5 for plaintiff and the refusal to give certain tendered instructions for defendant; likewise, the refusal to submit a special interrogatory tendered by defendant. The court gave for plaintiff 10 instructions; it gave 11 for defendant and one on the court's own motion. The number of tendered instructions by defendant, refused, was 13.

 We do not think that the issues raised by the pleadings called for what we regard an excessive number of instructions tendered, nor did they require the number of instructions given for both sides. It would unduly extend this opinion were we to discuss each refused instruction complained of. We have examined these refused instructions and find no merit in the points raised.

Instruction No. 5 for plaintiff reads:

"You are instructed that it was the duty of this defendant to furnish the plaintiff with a reasonably safe place in which to do his work, and if you find from the evidence that the defendant failed to furnish the plaintiff with a reasonably safe place in which to do his work, and that such failure on the part of the defendant to furnish such place was the direct and proximate cause of the injuries, if any, sustained by the plaintiff, then your verdict should be in favor of the plaintiff and against the defendant."

 The objection to this instruction is, that it tells the jury it was the unqualified duty of defendant to furnish plaintiff a reasonably safe place to work, instead of requiring defendant only to use reasonable care to furnish a reasonably safe place to work. Defendant relies on *Seaboard Air Line Ry. v. Horton,* 233 U. S. 492. We think this case is distinguishable. In the *Horton* case the court said that the trial judge, in the instructions to the jury, adopted the measure of responsibility respecting the character and safe condition of the place of work as prescribed by local statute instead of the Federal Employers' Liability Act, and further said as to the instructions given that they, in various forms, expressed the notion that the duty of defendant was absolute with respect to the safety of the place of work. We do not think the instant instruction is susceptible to the construction placed thereon by defendant. Defendant's given instruction No. 6 told the jury that defendant was not the insurer of the safety of its employee, and other instructions given for defendant told the jury that plaintiff had to prove negligence on the part of defendant. We cannot see how the jury was misled by instruction No. 5. It merely employed the language we generally find in the opinions of reviewing courts with respect to the duty

of the employer under this Act. Typical of most of the cases is *Larsen v. Chicago & N. W. R. Co.,* 171 F. (2d) 841, 844 (7th), where the court said:

"So, too, they have held that it is the duty of a railroad company to furnish its employees with a reasonably safe place to work. A duty which becomes imperative and exacting as the risk increases. Bailey v. Central Vermont Ry., 319 U. S. 350, 63 S. Ct. 1062, 87 L. Ed. 1444."

Also, *Porter v. Terminal R. Ass'n of St. Louis,* 327 Ill. App. 645 (65 N. E. (2d) 31).

 We think the instruction given by the court on its own motion is harmless and does not constitute reversible error.

The refused special interrogatory tendered by defendant reads as follows:

"Was the action of the plaintiff in putting himself in the position that he was in at the time of the accident conduct on his part which was reasonably foreseeable by defendant?"

 This interrogatory was properly refused. It does not correctly call for determination of an ultimate fact. Defendant did not take any exception to the refusal of the interrogatory and thereby waived the question for review. Civil Practice Act, § 65, ch. 110, [par. 189] Ill. Rev. Stat. [1951, Jones Ill. Stats. Ann. 104.065]; *Worthen v. Thomson,* 343 Ill. App. 62, 71.

We think defendant has had a fair trial, and the judgment is affirmed.

*Affirmed.*

LEWE, P. J. and KILEY, J., concur.