Lee Roy Kahn, a Minor by Julius F. Kahn, his Father and Next Friend, Appellee, v. James Burton Company, Jacob A. Krieger and Bessie Krieger, and Malkov Lumber Company, Inc., Defendants. Malkov Lumber Company, Coparty-Appellant.

Gen. No. 46,067.

Opinion filed January 11, 1954. Released for publication March 8, 1954.

HINSHAW & CULBERTSON, of Chicago, for certain appellant, and CROWE & ABRAHAMSON, of Chicago, for coparty-appellant; OSWELL G. TREADWAY, and BURT A. CROWE, both of Chicago, of counsel.

LOUIS G. DAVIDSON, and JOSEPH D. RYAN, both of Chicago, for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

Lee Roy Kahn, a minor, filed a complaint in the superior court of Cook county against James Burton Company, a corporation, Malkov Lumber Company, a corporation, Jacob A. Krieger and Bessie Krieger to recover damages for injuries caused by the alleged negligence of the defendants. Issue was joined. A verdict was directed in favor of the Kriegers. The jury found the corporate defendants guilty and assessed damages at $20,000. Motions by each of these defendants for a directed verdict, for judgment notwithstanding the verdict and for a new trial were overruled. Judgment was entered on the verdict. The corporate defendants have appealed.

Jacob A. Krieger and Bessie Krieger were the owners in joint tenancy of a vacant lot at 6642 South Richmond Street, Chicago. The lot, which faces east, has a frontage of 58 feet on Richmond Street and is 125 feet in depth. A north and south alley runs parallel to and west of Richmond Street. An east and west alley extending from the north and south alley to Richmond Street adjoins the lot on the south. Sometime prior to July 20, 1948, Jacob Krieger made arrangements with the James Burton Company to build on the lot a two-story brick house with full basement. He dealt with William Lipman and Harold Lipman, officers of the company. Krieger is an uncle by marriage to William

Lipman. Under a verbal agreement the Burton Company was to do everything except the mason and concrete work. Krieger had already made arrangements with a mason contractor to do that work. The plans for the house were completed and turned over to the Burton Company. Thereupon the mason contractor proceeded with the excavation work and poured the foundation. When the foundation and masonry work were completed, the masonry contractor notified Krieger that the carpenters could start. On July 19, 1948, Harold Lipman called the Malkov Lumber Company and ordered certain lumber to be delivered. For convenience, we will call the Kriegers the owners, the Burton Company the contractor, and the Malkov Lumber Company the supplier.

The contractor seldom built homes, its work being chiefly commercial and industrial. The contractor was to do the mason work. He could not spare the men to do that work and a new agreement was entered into whereby the owner would arrange for the masonry and brick work. When the brick work was up about 2 feet above the foundation so that the floor joists could go in, the contractor was to carry on. Thereupon the contractor called the supplier and ordered the joists and flooring. The supplier delivered the lumber on the lot on July 19, 1948. The order consisted of 2 pieces 2 x 10, 10 feet long; 12 pieces 2 x 10, 12 feet long; 14 pieces 2 x 10, 14 feet long; 50 pieces 2 x 10, 16 feet long and 267 pieces 1 x 6, 12 feet long. The delivery was made by its driver, Roscoe Hart. About 4:30 p. m. on July 20, 1948, plaintiff, then 11 years and 4 months of age, was riding his bicycle south in the public alley west of Richmond Street. His friend, Alphonse Mikszta, 9 years of age, was with him on his own bicycle. They had turned into the alley at 66th Street to get away from traffic. They had just been riding around. It was

a clear day. As they came south they saw the lot and the house under construction and the materials lying about, which plaintiff had seen about a week previously. Alphonse did not recall whether he had observed it previously. Quite a few boys and girls were playing on the lot when plaintiff saw it previously, but he had not been there before.

As they came south in the alley on their bicycles both boys saw the conditions and observed the lumber located on the southwest part of the lot, near where the two alleys intersect. It had the appearance of the prow of a boat to their imagination. They left the alley, got off their bicycles and went over to the stacks of planking and climbed up on them, using the steplike formation created by the uneven piling of the boards to get up. The lumber pile extended lengthwise north and south about 3 feet west of the trunk of a tree, a branch of which extended west towards or over the pile. Plaintiff climbed up the south end of the pile, the easterly tier, and it felt solid to him. He stayed at the south end of the pile which he called the "front" end. He had picked a piece of string off the ground near the lumber pile, and standing on the planking, reached up to tie one end of the string to a branch of the tree which was within reaching distance. He did not have to stretch. The condition was supposed to represent "a bell, a toll bell or something" on a ship to plaintiff. To Alphonse, plaintiff was tying the string to the tree "to dock the boat to." As plaintiff stood on the east side of the pile and Alphonse on the west side, the east tier suddenly slipped out from underneath plaintiff, the planks gave way and fell and the lumber pile toppled over. Some of the boards under him went down, then he went down on top of those, then more boards and planks came down on top of him. So far as he knew he had not done anything in the way of moving around

375

to knock the boards down or bump them over. He did nothing to disturb the boards or dislodge them before they fell. Mr. and Mrs. Madsen, who lived just to the north of the house under construction, ran out. Mrs. Madsen could not lift the heavy planks. Mr. Madsen, who found some heavy planks resting on plaintiff's back, removed the planks and released plaintiff. He was taken to a hospital for treatment of his injuries. The owners, who lived about a mile from the lot, did not see the lumber on the lot prior to the occurrence.

Roscoe Hart, the driver for the supplier, had no recollection of the delivery except that his name appeared upon the ticket. He was working for the supplier at the time. He had 10 years' experience driving lumber trucks and had a uniform practice as to the manner in which he loaded and unloaded and never varied from that practice. The truck consists of a tractor and a 16-foot trailer. On the bed of the trailer are 4 metal rollers, operated by a ratchet wrench. There is a crank on the side of the truck. The lumber is loaded into the truck by laborers at the lumberyard. The lumber to be used last is put on the bottom of the load and that to be used first on the top. Crosspieces are placed in the load to keep the lumber from spreading from side to side. The lumber is then checked with the ticket. Two chains are then wrapped around the load and each is drawn tight and locked with a binder. The load that was delivered to the lot was 4½ feet high and 6 feet wide. Its weight was 7 or 8 tons. On making delivery, a level spot for unloading is selected and 2x4s are placed on the ground to receive the load. By use of the crank on the side of the truck the load is moved back on the rollers until it is about half way off the truck. A chain is then thrown all the way around it and the lumber is bound together with a binder. The truck is then pulled from under the load and it comes

down. The chain is then removed. The lumber is then in one pile, close together, and in the same relative position as when on the truck. Chains and binders used to hold the lumber together on the truck were removed after delivery and the lumber pile was left without any bracing or support. The lumber was placed on the southwest corner of the lot within 15 feet of the intersection of the two public alleys forming the west and south boundaries of the lot. The boards on top of the pile were larger than the lower boards. The driver was not provided with anything to brace or support the piled lumber. The usage employed in delivering this lumber is the general uniform practice of lumber dealers who make deliveries all over Chicago. The piled lumber apparently remained as delivered until the occurrence.

▮ The plaintiff does not invoke the doctrine of attractive nuisance against the supplier, conceding that since it did not own or control the premises, that doctrine is not applicable to it. In support of its argument that the supplier owed plaintiff the duty, in piling and stacking its heavy planking, to exercise ordinary care for his safety and the safety of all others whose presence on the lot might reasonably be foreseen, plaintiff states that the evidence establishes that the supplier and its driver should have reasonably anticipated that children might come upon the lot and upon the lumber pile. Plaintiff says that this defendant could have reasonably foreseen that during the summer vacation children might play around the house while it was under construction and that it was reasonably foreseeable that children might be injured in view of the dangerous and unsafe condition in which the pile was left. Pointing out that the pile was 4½ feet high and not braced in any way, he states that the defendant erected a top-heavy structure which it failed to support or brace.

377

In arguing that the clear preponderance of the evidence supports the judgment against the supplier, plaintiff asserts that the planking was left on the lot where no watchman was on duty in close proximity to public alleys and at a place where children had been playing in . large numbers for weeks and where the defendant could have reasonably foreseen that youngsters might play. ██ Plaintiff had never played on the lot before the day he was hurt. He was not on the premises when the load of lumber was delivered and the supplier had no reason to anticipate that he would be there. This defendant was not in possession or control of the premises or of the pile of lumber at the time plaintiff came on the premises. This defendant did not owe the plaintiff any duty to warn him of danger, if any, since plaintiff was not present at the time the lumber was delivered and was unknown to him. There was no duty on the supplier to guard or protect the premises since it was not in possession or control thereof. Where there is no duty there can be no breach and consequently there is no negligence. The evidence is conclusive not only that the supplier owed no duty to the plaintiff but that it discharged its duty to the owners and to the contractor. The lumber was unloaded and placed on the ground according to the general uniform practice of lumber dealers in Chicago. There is no proof that the lumber was unloaded at a place where children had been playing in large numbers. The proof is that the children had been playing on the mound of dirt thrown up by the mason contractor and not where the lumber was deposited. There is no evidence that any child was present at the time the lumber was unloaded or that the supplier had any knowledge that any children had ever played on the premises.

██ ██ The case of *Stedwell v. City of Chicago*, 297 Ill. 486, cited by plaintiff, is not applicable to the facts

of the instant case. There the city maintained a high voltage electric arc wire along one of its streets. At a place where the wire was caused to dip under the elevated structure crossing the street, the plaintiff climbed crosspieces having the appearance of latticework, came in contact with the charged wire and was injured. He proceeded on the theory that the high voltage wire, together with the posts which could be easily climbed because of the crosspieces, constituted an attractive nuisance. The Supreme Court held that the finding of the trial court, affirmed by the Appellate Court, that the post with its ladder-like appearance constituted an attractive nuisance, was conclusive upon that question. That holding disposed of the city's contention that the plaintiff was a trespasser since the doctrine of attractive nuisance excludes the defense that the injured child is a trespasser. The court also pointed out that so far as the city was concerned the plaintiff was not a trespasser since at the time he was injured he was in a public street where he had a right to be. One using a public street is not a trespasser on such street. In the case at bar the premises were private. In *Holmberg v. City of Chicago,* 244 Ill. App. 505, cited by plaintiff, a contractor doing excavating work preparatory to the erection of an apartment building, dumped large quantities of sand in a public street making a pile 50 feet long and over 8 feet in height. The plaintiff's intestate, in his play, dug a hole in the pile of sand which caved in on him, as a result of which he was suffocated. Here again the child could not have been a trespasser in that he was in a public street, a place where he had a right to be.

Plaintiff places great reliance on *Wintersteen v. National Cooperage & Woodenware Co.,* 361 Ill. 95. The defendant in that case loaded a railroad car with barrels in Peoria, Illinois, and shipped it by

rail to Pennsylvania. The plaintiff, while unloading the car in Pennsylvania, was injured, due to the alleged negligent failure of the defendant to properly load the barrels. The defendant contended that it owed no duty to use care for the plaintiff's safety as there was "no contract between the plaintiff and the defendant." The court, in affirming the judgment for the plaintiff, said (103):

"It is axiomatic that every person owes a duty to all persons to exercise ordinary care to guard against any injury which may naturally flow as a reasonably probable and foreseeable consequence of his act, and the law is presumed to furnish a remedy for the redress of every wrong. This duty to exercise ordinary care to avoid injury to another does not depend upon contract, privity of interest or the proximity of relationship between the parties. It extends to remote and unknown persons."

The holding in the *Wintersteen* case has no application to the facts in the case at bar. In that case the defendant negligently loaded a freight car with barrels in a manner contrary to the rules of the Interstate Commerce Commission. When the car arrived at its destination the plaintiff, in the exercise of ordinary care, attempted to open the door for the purpose of unloading the barrels. Due to the negligence of the defendant and the improper loading, some of the barrels fell from the car and injured him. In that case the plaintiff was rightfully undertaking to open the car door at the time he was injured and the injury naturally followed as a reasonably probable and foreseeable consequence of the negligent act. The defendant knew that someone must necessarily open the door to unload the barrels. In the case at bar plaintiff's injury did not naturally follow as a reasonably probable and foreseeable consequence of the defendant's delivery of the lumber to

the premises in the manner in which it was delivered. In our opinion the case of *Wickstrom v. Ringling Bros.*, 313 Ill. App. 640, in which the defendant negligently furnished plaintiff an unsafe seat in which he was invited to sit, and *Rouse v. New York C. & St. L. R. Co.*, 349 Ill. App. 139, in which the defendant placed a "pot" signal so close to the rails that it endangered the safety of its employees, do not support plaintiff's position here. We hold as a matter of law that the supplier was not guilty of any negligence and that the judgment against it should be reversed. The supplier owed the plaintiff no duty to stack the lumber in any particular way. It undertook to unload and stack the lumber in such a manner that it could be conveniently used by the owner or the contractor. The evidence shows that this defendant did that. There is no evidence from which it can be inferred that the lumber left on the premises by the supplier required any support or brace to keep it in position. The contractor does not contend that the lumber was improperly unloaded or stacked.

We turn to a consideration of the case against the contractor. The plaintiff insists that the contractor maintained an attractive nuisance on the premises. He says that children customarily played there for several weeks while the construction was going on and that it was the duty of the contractor, who was in possession and control of the lot, to use ordinary care for the safety of the children. The jury answered an interrogatory specifically finding that the contractor maintained an attractive nuisance on the lot at the time of the occurrence. The contractor ordered the lumber 4 or 5 days before the construction would start. It knew of the uniform practice of lumber dealers in delivering, unloading and piling lumber. It knew that the lumber would be left piled 4 or 5 feet high, unbraced and unsupported. The traveling superintendent of the con-

381

tractor was on the lot on July 20, 1948, the day of the occurrence. He was employed by the contractor at the time of the trial but was not produced as a witness. He was in charge of the construction job for that defendant. The mishap took place about 4:30 p. m., after usual working hours in the building trades. He apparently saw the lumber there since he ordered the carpenters to the job and they worked there the next day.

The evidence shows that the owners employed a mason contractor who did the excavating, poured the foundation and laid the brick to a height where it was necessary to insert the joists and floor boards before proceeding further. It was the dirt piled up by that mason contractor which attracted the children to the premises. The mason contractor must necessarily have been in possession and control of the premises to some extent during the progress of the work he was doing. The contractor had not begun work on the house and had no employees on the lot until the day of the occurrence. Mr. Walder, the contractor's traveling superintendent, visited the site on July 20, 1948, to see if the lumber was there. The contractor's workmen did not go on the job until the day after the mishap. The evidence does not show that the contractor had or should have had any knowledge that children were in the habit of coming upon the lot for amusement. At the time the contractor, on request of the owners, called the supplier and ordered a quantity of lumber, its employees had not been on the lot or seen the lot. It cannot be said that the contractor in ordering a quantity of lumber became charged with notice that the lumber would, when delivered, become a dangerous instrumentality and so dangerous that it should attend to its unloading, see that it was piled properly and from there on maintain a guard or watchman to prevent children from coming upon the lot. In *Wolczek v. Pub-*

*lic Service Company of Northern Illinois,* 342 Ill. 482, the court said (488):

"The law fixes a different standard of liability in case of injury to children going upon premises where there is a dangerous agency attractive to children, than that which applies to adult persons. Where the owner creates upon his premises a dangerous object which from its nature and location has a tendency to attract onto the premises children who from childish instincts are drawn into the danger, the law requires such reasonable precautions as the circumstances admit of to prevent them from playing with the thing or to protect them from injury from it. It is likewise the rule that the owner of private grounds is under no obligation to keep them in any particular state or condition to promote the safety of trespassers, intruders, idlers, bare licensees, or others who come upon them without invitation, either expressed or implied. This rule applies equally to adults and children. (*Follett v. Illinois Central Railroad Co.,* 288 Ill. 506; *McDermott v. Burke,* 256 id. 401.) The owner of land, however, who allows children to play on his premises must use ordinary care to keep the premises in a safe condition, for the children, being without judgment, are likely to be drawn by childish curiosity into places of danger. (*Ramsay v. Tuthill Material Co.,* 295 Ill. 395.) This rule applies where the owner expressly or by implication invites children onto the premises. . . . The rule recognized in this State as to implied invitation is, that where the owner of the premises maintains a dangerous condition or thing of such a character that he may reasonably anticipate that children, who by reason of tender years are incapable of exercising proper care for their own safety, are likely, because of their childish instincts, to be attracted to the dangerous thing and thereby exposed to dangers, he is required to use reasonable care

383

to protect them from injury, provided it is shown that such dangerous condition or thing is so located as to attract children from the street, playground or place where they have a right to be. . . . The above mentioned rule is based on a principle long engrained in the decisions of this court, that justice requires recognition of the fact that a child of tender years should not be held to the same accountability as an adult. This is a sound doctrine, long accepted by this court and calculated to make men more considerate of little children. It is based on the humane consideration that where one maintains on his premises a dangerous agency, so located as to attract children from a place where they have a right to be, and that such owner knows, or should know, of its dangerous character and of its attractiveness to children and the probability of injury to them by it but does not use reasonable care to protect or warn them against it, then he is guilty of negligence. There has been no deviation from this rule since the case of *City of Pekin v. McMahon,* 154 Ill. 141."

 The doctrine of attractive nuisance is not applied loosely. An attractive place to play or an attractive object or instrumentality and a resulting injury therefrom does not constitute the place or instrumentality an attractive nuisance. In *Burns v. City of Chicago,* 338 Ill. 89, the court, quoting with approval from a Minnesota case, said (98):

" 'To the irrepressible spirit of curiosity and intermeddling of the average boy there is no limit to the objects which can be made attractive playthings. In the exercise of his youthful ingenuity he can make a plaything out of almost anything and then so use it as to expose himself to danger. If all this is to be charged to natural childish instincts and the owners of property are to be required to anticipate and guard against it, the result would be that it would be unsafe for a man

384

to own property, and the duty of the protection of children would be charged upon every member of the community except the parents or the children themselves.' "

Certain conditions and situations must obtain to make the doctrine applicable. The person against whom it is invoked must have been in possession or control of the premises and of the instrumentality which caused the injury. The instrumentality or condition must be dangerous in itself and likely to cause injury to those coming in contact with it. It must be attractive and alluring to young children who are incapable because of their youth of comprehending the danger. The instrumentality or condition must be exposed and readily accessible to the children. The person in control or possession of the premises must have foreseen or, in the exercise of ordinary care, should have foreseen that children would come in contact with it. The purpose of invoking the doctrine is to justify or excuse what otherwise would be the trespass of the children upon the premises in possession or control of the person alleged to be liable.

 The courts have uniformly held that a lumber pile on private premises does not constitute an attractive nuisance. The number of cases involving lumber piles as such are few. However, there are many cases involving stacks of railroad ties on the railroads' right of way and others involving piles of poles, wood piles and steel beams. See *Morris v. Lewis Mfg. Co.*, 331 Mich. 252; *Emery v. Thompson*, 347 Mo. 494; *Kelly v. Benas*, 217 Mo. 1; *Boyette v. Atlantic Coast Line R. Co.*, 227 N. C. 406; *Middleton v. Reutler*, 141 App. Div. 517, 126 N. Y. Supp. 315; *Branan v. Wimsatt*, 54 App. D. C. 374, 298 Fed. 833; *Baltimore City v. DePalma*, 137 Md. 179; *Lynch v. Knoop*, 118 La. 611; *Carr v. Oregon-Washington R. & Nav. Co.*, 123 Ore. 259; *Anderson v. Peters*, 22 Tenn. App. 563; *Pollard v. McGreg-*

gors, 239 Ala. 467; *Lovell v. Southern Ry. Co.*, 257 Ala. 561; *Holland v. Wisconsin Michigan Power Co.*, 296 Mich. 668; *Martino v. Rotondi*, 91 W. Va. 482. There appears to be no case decided by the courts of review in Illinois in which the court has been called upon to consider the applicability of the doctrine of attractive nuisance to a pile of lumber on private premises. This is significant in view of the fact that thousands of loads of lumber have been deposited on lots where houses were under construction and under conditions similar to those disclosed by the evidence. The limitations placed upon the applicability of the doctrine and the reasoning adopted by the Illinois courts follow the pattern of the courts in the cited cases in concluding that the doctrine is not applicable to a pile of lumber or similar material on private premises. See *Burns v. City of Chicago,* 338 Ill. 89; *Mindeman v. Sanitary District,* 317 Ill. 529; *McDermott v. Burke,* 256 Ill. 401; *Heimann v. Kinnare,* 190 Ill. 156; *Rodgers v. Beach,* 288 Ill. App. 462; *Prickett v. Pardridge,* 189 Ill. App. 307; *Matijevich v. Dolese & Shepard Co.,* 261 Ill. App. 498. From the decided cases and the undisputed evidence we hold as a matter of law that the pile of lumber was not a dangerous instrumentality and that the contractor was not guilty of negligence. The distinguishing feature of the cases holding a contractor or owner liable is that the instrumentalities causing the injury were upon a public street or sidewalk where children had a right to be and where their presence should have been anticipated and precautions taken to protect them from injury. Clearly the doctrine of attractive nuisance is not applicable to the factual situation of this case.

It is unnecessary to extend the opinion by passing on the other points argued. For the reasons stated the judgment of the superior court of Cook county is reversed and the cause is remanded with directions to

■■■

■■■

enter judgment for the James Burton Company, a corporation, and Malkov Lumber Company, Inc., a corporation, and against the plaintiff.

*Judgment reversed and cause remanded with directions.*

NIEMEYER, P. J. and FRIEND, J., concur.