**BLYTHEVILLE COTTON OIL CO. v. KURN et al.**

**HUMKO CO. v. SAME.**

**Nos. 10096, 10097.**

Circuit Court of Appeals, Sixth Circuit.
June 1, 1946.

---

L. P. Miles, Sr., of Memphis, Tenn. (Miles & Miles, of Memphis, Tenn., on the brief), for Blytheville Cotton Oil Co.

John L. Exby, of Memphis, Tenn. (Evans, Exby, Moriarty & Creson, of Memphis, Tenn., on the brief), for the Humko Company.

Cooper Turner, of Memphis, Tenn. (Canada, Russell & Turner, of Memphis, Tenn., on the brief), for appellees.

Before HICKS, SIMONS and MILLER, Circuit Judges.

SIMONS, Circuit Judge.

The Humko Company bought 60,000 pounds of cottonseed oil from Blytheville. It was shipped by Blytheville in a tank car provided by the purchaser, over the railway being operated by the trustees, and was lost through leakage in transit. Humko sued both the shipper and the railroad, and in a trial to the court without a jury, Blytheville was held responsible for the loss because of negligent loading, and the railroad was absolved from liability. Blytheville appeals in No. 10096; Humko, though supporting the judgment there, conceived it to be necessary to lodge a formal appeal in No. 10097, in order to protect its rights against the railroad if the judgment against the shipper is reversed.

The contract between Humko and Blytheville embraced the rules of the National Cottonseed Products Association. Humko was to furnish the tank car but the seller was to be responsible for losses due to failure to comply with instructions regarding its loading. The seller was required to inspect the car before loading to see that all parts were in good operative condition, and failure to observe the rules would constitute negligence and relieve the buyer of responsibility for loss. The car furnished by Humko was a standard tank car equipped with a screw type outlet valve at the bottom of the tank, operable by a hand wheel on the top of the car connected to the valve by a 7 foot rod. The hand wheel was available for manipulation through an opening at the top of the car, the opening being closed during transportation by a dome cover which was screwed on. Under the car and connected with the outlet valve, was an outlet pipe, to the bottom of which was screwed a cap, the cap being also attached to the car by a chain. Its purpose was to prevent foreign matter from entering the outlet pipe and provide a place for sealing the car. It was not designed to hold the load of oil if the valve should be insecure, though ordinarily it would retain it if its threads were not worn and it was tightly fastened. If the main outlet valve is firmly seated it can not be displaced through the valve opening without great leverage and inevitable destruction, and ordinary handling of the car in transportation has no effect upon it.

The rules of the American Association of Railroads provide that in loading a tank car of this type the outlet valve should first be inspected, then seated, the outlet cap remaining off until the car is completely loaded. Thus it can definitely be ascertained whether there is a leak. The court found that car owners and shippers of oil generally follow this method of load-

ing; that Blytheville did not conform to it, but loaded the car with the outlet cap in place.

Its findings in these respects are supported by the record. There is evidence that upon receipt of the car an employee of Blytheville, after looking into it from the dome opening, turned the hand wheel until it seemed that the outlet valve was seated; at the same time another employee screwed on the cap using a 24 inch wrench applied to a plug in the center of the cap. The car was then loaded, the dome cover screwed on and the railroad issued its bill of lading. It appears that while the method used for fastening the outlet cap might have been sufficient to tighten it so as to retain the contents of the car without leakage, even with an open outlet valve, it would not necessarily be tight enough to prevent the cap from working loose during switching operations and transportation, and that the better practice is to screw the cap on with a 48 inch wrench applied to the cap itself.

The tank car was incorporated into a train bound for Memphis. Leakage was not discovered until the train arrived at Wilson, Arkansas, after dark, about 27 miles from Blytheville, at which time the cap was off and hanging by its chain. Subsequent investigation showed the leakage to have begun about 3½ miles from Blytheville, there being visible evidence of oil flowage on the roadbed from that point to Wilson. At Wilson the crew attempted to replace the cap but were unable to do so because of the force of the oil flow. They also tried to open the dome to seat the outlet valve, but because of the tightness with which it had been affixed and a lack of necessary tools, were unable to do so. The car was then placed on a siding and the train proceeded. Before leaving Wilson the railroad's foreman was notified of the emergency, but was unable to do anything about it.

The following morning representatives of Blytheville and the railroad inspected the car. The dome cover was removed with the aid of a single-tree, and the outlet valve was found to be open. It was observed that the valve rod was bent in the middle about 3½ inches out of line. It

was also found that the bent rod struck the protruding top of the shell as it was turned, though with sufficient force the rod could have been turned to seat the valve and, when seated, the car would hold a load of water.

Blytheville, in its defense below and in its present challenge to the judgment, disclaims negligence in loading the car and asserts negligence on the part of the railroad in failing to guard the shipment while it was in its yards at Blytheville and in not stopping the flow of oil at Wilson, where, it contends, the greater part of the oil could have been saved notwithstanding the leak. It also charges error, on the part of the court, in refusing to reopen the case, after judgment, for additional testimony regarding tools it alleges were available to the railroad at Wilson, by which the dome could have been removed, the valve seated and further leakage stopped.

It is clear from this recital that Humko is entitled to a judgment. It paid its money and failed to get the oil. As the case developed, neither defendant challenged the merit of Humko's claim. The controversy resolved itself into one between Blytheville and the railroad. A prima facie case having been made against Blytheville for failure to follow approved practice in loading the tank car, in the subsequent discovery that the valve was not seated and that the operating rod was bent notwithstanding its contractual duty to inspect, it became incumbent upon Blytheville to present some reasonable explanation for the loss of the oil other than through its own negligence. It does not disclaim its duty to inspect the car to see that all mechanical parts were in good order. It is unable to refute the evidence that the valve was unseated and the outlet cap displaced. The most that it is able to do is to suggest, as a theory for the loss of the oil, a tampering with the car by persons unknown, after it had been delivered to the railroad. There is not a particle of evidence that anyone had tampered with the car. Blytheville undertakes to bridge the gap by suggesting a succession of possible inferences leading to a conclusion that the loss of oil was due to the negligence of the railroad. It says that the

railroad did not continuously guard the car while it was on its siding, presenting an opportunity to persons unknown to tamper with it; secondly, that the shipment was made during a period of limited and rationed petroleum supplies, so that a motive existed for tampering with cars suspected of containing such products; and, thirdly, that there existed ability to tamper with the car since the dome cap could be unscrewed by the use of a horizontal bar or similar tool, the valve released by the turning of the wheel and the valve cap unscrewed.

To support these purely speculative inferences, there is no particle of proof, and the court was asked to guess that what possibly might have happened, did happen. The court declined the invitation, and so do we. To assume the commission of an act by persons unknown because they might possibly have had motive, opportunity and ability to commit it, is to substitute surmise and guess for proof. Even were we to assume that such speculation could be substituted for evidence, the substantial facts refute the implications urged upon us. From the time the railroad took the car, it was in its yards close to the freight and passenger station buildings where railroad employees were constantly working, where no trespassers were observed and where no sign of oil leakage was subsequently discovered. It is refuted also by the physical facts that the valve could not be opened from the bottom without its being broken or otherwise injured, that the dome cover was on so tight it could not be opened without the effort of two men with a lever to remove it.

■■■ The court found that Blytheville had negligently failed in its duty to properly load the car, and that this breach was the proximate cause of the loss. The question being solely one of fact, even were we in disagreement, which clearly we are not, we should be required to accept its findings unless clearly erroneous, and we are unable to perceive error. Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. The only legal question that is to be inferred from the prolix and repetitive brief of Blytheville, relates to the obligation of a railroad to inspect a car loaded by the shipper. The rule seems to be clear that when a fully loaded car is delivered to the railroad, the railroad company is responsible only for such defects as may be discoverable by such visual inspection as it is able to make, and it is not responsible for imperfect packing or other carelessness on the part of the shipper. Alabama & V. Ry. Co. v. American Cotton Oil Co., 5 Cir., 249 F. 308; Alabama Great Southern R. Co. v Morris & Co., 5 Cir., 249 F. 312; Southern Cotton Oil Co. v. Atlantic Coast Line R. Co., D.C.E.D.Va., 17 F.2d 411. The state cases are in accord. Chesapeake & Ohio Ry. Co. v. Nat'l Fruit Products Co., 155 Va. 438, 155 S.E. 630, 72 A.L.R. 878; Fordyce v. McFlynn, 56 Ark. 424, 19 S. W. 961; Central of Georgia R. Co. v. Chicago Varnish Co., 169 Ala. 287, 53 So. 832. See 4 Elliott on Railroads (3rd Ed.) § 2229. There is no contention here that the railroad could have discovered the unseated valve, the bent rod, or the improperly tightened cap.

■■■ The contention that the greater part of the oil could have been saved at Wilson had the railroad men who tried to remove the dome with a Stillson wrench been supplied with proper tools or been properly instructed in the opening of the dome cover, must be rejected. The railroad men were switchmen and sectionmen and were not experienced in the loading or unloading of tank cars. The railroad is not to be charged with failure to foresee the negligence of a shipper in the loading of such cars. Nor was the District Court obliged to take judicial notice of tools that might have been available in railroad shops or oil stations. These are not facts of such universal knowledge that notice will substitute for proof. In any event, the evidence as to the amount of oil which could have been saved is wholly speculative and but a mere guess.

■■■ The final claim of error in the failure of the court to re-open the case for the taking of additional testimony, must also be rejected. The motion was the equivalent of a motion for a new trial. The granting of such motion is in the sound discretion of the trial judge and his determination will not be overturned except for its clear abuse. Holmgren v. U. S., 217

U.S. 509, 30 S.Ct. 588, 54 L.Ed. 861, 19 Ann.Cas. 778; United States v. Mayer, 235 U.S. 55, 35 S.Ct. 16, 59 L.Ed. 129; Chambers v. Anderson, 6 Cir., 58 F.2d 151. The motion was not based upon newly discovered evidence. Clearly, Blytheville could readily have submitted the subsequently proffered proofs at the trial.

Affirmed.