Ivan CLARK, Jr., by his next friend, Ivan Clark, Plaintiff-Appellant,

v.

ZUZICH TRUCK LINES and William Simmons, Defendants-Respondents,

v.

WHITE MOTOR COMPANY, a corporation, Third Party Defendant-Appellant.

Nos. 23154, 23160.

Kansas City Court of Appeals.

Missouri.

Feb. 6, 1961.

Goldman & Goldman, St. Joseph, for appellant.

James H. Ottman, Kansas City, for respondent William Simmons.

Price Shoemaker, St. Joseph, for respondent Zuzich Truck Lines. Sebree, Shook, Hardy & Ottman, Shoemaker and Reital, of counsel.

Smith, Sherwood, Utz & Litvak, St. Joseph, for third party defendant-appellant.

SPERRY, Commissioner.

This is a damage suit growing out of a collision when an over-the-road tractor, being operated bobtail, swerved across Highway 71, in Platte County, and struck an oncoming automobile in which Ivan Clark, Jr., a baby, was a passenger, causing injuries to him and to William Simmons, the owner and operator of the tractor. Clark sued Simmons and Zuzich Truck Lines, Simmons' lessee and employer, and Simmons brought White Motor Company, hereafter referred to as White, into the case as third party defendant. The verdict and judgment was for Clark, Jr., in the amount of $3000 and against White; and in favor of Simmons as against White in the amount of $4000. Clark and White have appealed.

Clark's original theory of recovery was that of negligence of Simmons in the operation of the tractor. Simmons' theory was that the tractor, which was built and sold to him by White, was defective in construction and materials, resulting in the breakage of a ball stud, a vital part of the steering mechanism, causing Simmons to lose any and all control over the movement of the tractor. White contended that the collision was due to the negligence of Simmons in the operation of the truck, that the ball stud broke when the tractor struck the automobile, or that it broke when it ran into some trees some 160 feet south of the point of collision and, consequently, contributed nothing toward causing the collision. White moved for a directed verdict at the close of all of the evidence. The issue is whether the stud was broken *before*, or *after*, the collision with the car. If it was broken prior to the time of the collision, as the jury found then the judgment must stand; if it broke at the time of the collision with the car, or when it ran into the trees, then the judgment should be reversed and the cause remanded. In any case, it is purely a question of fact if there was substantial evidence. The court must determine whether there was substantial evidence to support Simmons' theory; and, in reviewing the evidence, we must accept as true all of it that supports his theory, and draw all reasonable inferences therefrom in favor of the verdict.

White admits its duty and responsibility, as a manufacturer of motor vehicles for use on the highways, as this tractor was designed to be used, to properly design, manufacture, inspect and test them, MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, 1053, L.R.A.1916F, 696; and its evidence was directed toward establishing the fact that it did so in this instance. It produced highly qualified and skilled professional men and craftsmen who detailed the method of manufacture and installation of the ball stud which was found to have been shorn off, in one blow of force, after the tractor came to rest.

Their testimony constituted substantial evidence tending to prove that it was broken either at the time the tractor collided with the automobile, or when it struck two or three trees thereafter; that no force short of that involved in such collisions would have been sufficient to break the ball stud. Their testimony was to the effect that the yield strength of the relay lever arm, into which the shank of the stud had been fastened and from which it was dragged (after the end broke off) by distorting the shape of the metal surrounding the hole into which it had been recently set, was 112,000 pounds, and that no such force would be encountered in ordinary road operations. The inference is that such a force may have been exerted by reason of either of the collisions mentioned.

But there was much and substantial testimony other than that coming from White's engineers, metallurgists and craftsmen. The accident occurred on an August afternoon, on a straight stretch of concrete highway a few miles south of Platte City. The pavement was dry and visibility was good. Simmons was proceeding south, travelling down a short, gentle grade and Clark was driving north down a similar slope. Each saw the other at the summit of the respective grades when approximately 500 feet apart. The speed of the tractor was from 45 to 55 miles per hour. Simmons said that the pavement was rough and his lane was only 9 feet wide; that his tractor was 8 feet wide; that he carefully watched his driving as the oncoming car neared; and that he pulled to the west side, to the lip of the pavement, which is from 4 to 6 inches high. At about the bottom of the grade, there was a concrete drainage outlet on the west side of the pavement. The collision occurred a short distance south of that point.

Simmons' truck was about 3 months old, had 24,000 miles on it, was serviced by White, was in good mechanical condition, and he had never had trouble with the steering apparatus. He said that he was familiar with the road and knew that, in meeting a car at that point, he would have to crowd the lip of the pavement; that he did so and the wheels began to climb it, as they have a tendency to do; that, in order to correct that action, he maneuvered it to the left and let it "drift" away from the lip to the center line, but not over it; that, until that time, the tractor had responded to his control, but then it seemed to jump to the right, then it jumped to the left, and he had no control over it; that the steering wheel "just went slack" when he attempted to pull it off of the lip the second time, and he could not turn it; that it came back "over the lip, off the lip and towards the car", which was from 30 to 50 feet from him, in the east traffic lane; that he had no control over it; that he was thrown against something and became unconscious; that he recovered consciousness on the roadside after the truck had come to rest against the trees.

Mrs. Arndt was driving south on Highway 71 and came up behind the Simmons tractor. She stated that the road was narrow and hilly and that she followed it for "some distance" because she did not care to pass it on that stretch of road; that she saw the Clark car just as the collision occurred; that the tractor was in its lane immediately before the collision occurred "and then all of a sudden he veered diagonally across the highway * * * he just cut right across the highway"; that she was watching the tractor; that she saw the driver flip out a cigarette some time before the collision; that when the truck veered across the road she thought: "I don't believe it, that suddenly a truck goes across the highway in the opposite lane".

After the accident the ball stud connecting the relay lever arm with the upper drag line of the steering apparatus was fractured at the end protruding from the lever, and the shank had been dragged out of the hole in the arm in a manner similar to dragging a stopper out of a bottle sidewise, so that the hole was distorted. It was conceded that the tractor operator would have no control over the movements of

the truck after the stud was out of the lever arm.

Simmons offered the testimony of Dr. Howard, associate professor of engineering at Kansas City University, and also associated with Weldon Laboratory of Kansas City as a consultant in metallurgy. He stated that he had tested, for comparison, a new ball stud identical in every respect with the one here involved.

White's evidence disclosed that it buys steel bars manufactured to its specifications, cuts them into proper lengths, and machines and tools them to the required shape and specifications. A ball is left at one end, and the end of the shank is tapered down and finely tooled so that it will fit into the hole in the lever arm. The stud is hollowed out at the end. The hole in the arm is machined so as to taper and form a perfect fit for the stud, which is forced into it under 6000 pounds pressure. The end protrudes beyond the arm and that end is then heated until it becomes plastic, whereupon it is "upset" and is smashed down, or riveted. When installed, it, with the arm, forms virtually one solid piece of metal.

Dr. Howard stated that this method differs from that recommended in the Standard Automobile Engineers Handbook, (S. A. E.), generally recognized as the highest authority on the subject. There it is recommended that the stud and the hole be tapered and *threaded* so that the stud may be firmly screwed into the hole, then secured with a nut. The protruding end is not hollowed out, but it has a transverse hole into which a cotter key is inserted to prevent the nut from working loose. He pointed out that the end of the stud, so installed, is stronger than the one used by White because: (1) none of the metal is taken away by boring; (2) there are no sharp angles, (which tend to cause weaknesses) such as are caused by smashing the end of the stud, instead of leaving it beveled and tapered; and (3) the uniform strength and toughness of the metal of the shank of the stud has not been

changed, as it is by heating and then tempering, so that there is no metallurgical notch (a weakness at that point) which results when steel of a given hardness and toughness meets with a section which is harder (and more brittle), which occurred in the stud here involved because of the heating and tempering of the protruding end.

There was also testimony to the effect that the steering apparatus would not have been affected merely by the fracture of the protruding end of the stud, so long as the portion that was in the hole remained therein. From that evidence the jury could have believed that if the method recommended in S. A. E. had been followed in the manufacture and installation of the parts involved there could have been no collision provided that they believed that the ball stud broke and pulled out of the lever arm *before* the collision occurred; that such construction may have been a contributing or the chief cause of the collision.

However, to determine the final answer to the only question posed here, we must refer to the testimony of Simmons and Mrs. Arndt. Simmons said that, until the tractor wheels contacted the lip of the pavement the second time, he was in complete control of the tractor but that, at that time, the steering wheel just went slack, that he could not steer it, and that it cut diagonally across the road and collided with the automobile.

Mrs. Arndt stated that the tractor was proceeding at about 50 miles per hour, in the proper lane; that she noticed nothing unusual until suddenly it just went diagonally across into the other lane.

██ Other than the fact that the tractor suddenly cut across the road when and as it did, there is nothing in this record from which it could be inferred that the collision was due to Simmons' negligent act. His testimony constitutes competent and, if believed by the jury, substantial evidence of the facts about which he testified. If what

he stated is true, then the failure of the steering mechanism is the only reasonable explanation shown under the evidence for the erratic behavior of the tractor culminating in the collision.

The question was one for the jury and the judgment is affirmed.

MAUGHMER, C., concurs.

PER CURIAM.

The foregoing opinion of SPERRY, C., is adopted as the opinion of the court.

All concur.