83 N.J. Super. 505 (1963)
200 A.2d 511
LAVINA MAE McCOMISH, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF ROBERT G. McCOMISH, DECEASED, PLAINTIFF-RESPONDENT,
v.
HARRY L. DeSOI, ET AL., DEFENDANTS, AND BRENNAN COMPANY, INC., ETC., DEFENDANT-APPELLANT, AND BELOIT IRON WORKS, ETC., DEFENDANT-APPELLANT.
ROBERT R. TOMAN, PLAINTIFF-RESPONDENT,
v.
HARRY L. DeSOI, ET AL., DEFENDANTS, AND BRENNAN COMPANY, INC., ETC., DEFENDANT-APPELLANT, AND BELOIT IRON WORKS, ETC., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 29, 1962.
Decided March 18, 1963.
*508 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Clifford W. Starrett argued the cause for defendant-appellant, Brennan Company, Inc. (Messrs. Schenck, Smith & King, attorneys; (Mr. Starrett, of counsel).
*509 Mr. Philip M. Lustbader argued the cause for defendant-appellant, Beloit Iron Works (Messrs. Schneider, Lustbader & Morgan, attorneys).
Mrs. Janet W. Freeman argued the cause for plaintiffs-respondents (Mr. Fred Freeman, attorney; Mrs. Freeman, on the brief).
The opinion of the court was delivered by FREUND, J.A.D.
Defendants, Beloit Iron Works (Beloit) and Brennan Company, Inc. (Brennan), appeal from final judgments entered on jury verdicts in Superior Court, Law Division, awarding $160,000 to Lavina Mae McComish, administratrix ad prosequendum for the estate of Robert G. McComish, deceased, and $16,500 to Robert R. Toman. They further appeal from the denial of their respective motions to dismiss, for judgment notwithstanding the verdicts and for a new trial.
McComish and Toman were employed by the Whippany Paper Board Company (Whippany) of Whippany, N.J. McComish was killed and Toman injured on June 22, 1958 by the fall of the wire carriage of a paper-making machine. This carriage was being lowered by the use of a wire cable "A-sling," which was attached to an overhead crane. Plaintiffs claim that the cables and rigging of the A-sling were negligently constructed, installed, inspected and supervised, causing the injuries sustained as the natural consequence of this negligence. The pivotal question concerning liability is the duty owed by defendants, jointly or individually, to the plaintiffs. Each defendant denies this duty and claims that the trial judge erred in not granting its respective motions to dismiss, for judgment notwithstanding the verdict and for a new trial. Consequently, the relationship between the parties must be explored to determine the nature of this duty.
Beloit built, in its plant in Wisconsin, the basic paper-making machine, described as the No. 4 machine. Approximately 700 feet long and two stories high, the machine was *510 matchmarked, disassembled and shipped to the Whippany plant, where it was reassembled. Beloit provided engineers at Whippany throughout the entire installation period. Robert Mayo was a Beloit erecting engineer and had worked at Whippany for a year prior to the accident. Although he testified that he was merely a coordinator between Whippany and Beloit, his co-workers described him as actively supervising and directing the operations. In his statement taken the day after the accident, Mayo commented that he was a field engineer for Beloit and "I am supervising the installation of the No. 4 machine at Whippany Paper Board * * *. I made the plan for the strongback, and the mill men followed my plans." The strongback, a steel beam, formed the base of the A-sling.
During the construction of the No. 4 machine, the original Beloit plans for the movement of the wire carriage had to be altered due to a row of columns and overhead beams in Whippany's plant. The wire carriage, weighing approximately a ton, had to be repeatedly lifted and moved from one end of the machine to the other, depending upon the quantity and quality of the paper to be manufactured. While the original plans called for lifting or lowering this equipment by two vertical cables, the revised plan called for an A-sling to raise or lower the wire carriage. The A-sling was made of wire cable leading from the ends of the strongback to a single round shackle, to which the crane was attached. The wire ends were each fastened by two Crosby clips. The revised plan called for 3/4-inch diameter steel cable to be used for the arms of the sling.
Myron Cobb, Jr. was another Beloit engineer on the premises at the time of the accident. He testified that the original design provided for lifting the strongback by two crane hooks perpendicular to the line of the strongback. Cobb testified that he made the sketch suggesting the construction of the strongback.
Whippany contracted with Brennan to "[f]urnish all necessary labor, supervision, mechanics, tools, equipment and *511 materials required for the complete installation of the machinery" built by codefendant Beloit. Brennan's contract continues:
"* * * services of the manufacturer's supervisors shall be engaged by this Contractor where this Contractor feels it necessary for the proper installation of this Contractor's work. The cost of supervision of the manufacturer's representatives is not included in the basic contract. This Contractor will be subordinate to the manufacturer's supervisors in all matters concerning method of assembly, preparation of components, alignment, and all else pertaining to the proper installation of the machinery." (Emphasis added)
John Schultz, Brennan's superintendent, stated that Brennan's employees bolted the end plates after the A-sling was attached to the strongback. Schultz testified that Brennan only "installed" but did not "fabricate" the A-sling. Although he said that Brennan had complete charge of the assembly and rigging of the machine, Schultz later qualified this statement by testifying that Brennan did "all except the strongback."
As noted, Beloit's engineer, Cobb, designed the original drawing for the A-sling. A penciled copy of the A-sling appears on the Beloit plan entitled "Wire Pole Chuck Stand Assem." Schultz testified that he made this sketch after the accident. However, it was called to his attention that the notations on the penciled sketch were in the future tense, and he agreed. The use of the future tense indicates that his notations were not declaratory of an existing state of facts, but intended to direct the operation. Although Schultz testified that his additions to the sketch were made the day after the accident, his credibility on this matter was cast in doubt. He asserted that he made the pencil notations while observing the A-sling at Whippany, but his attention was immediately called to the fact that the wire rope cables were at police headquarters on that date.
The actual construction of the A-sling was made by two Whippany employees, Robert W. Moll and Paul Opanowitz. Concerning the size of the cable used in the A-sling, Moll testified that "as I recall, the drawing called for three-quarter *512 [inch] and Paul [Opanowitz] picked out some cable he said was three-quarter, and that's what we used." Both men testified that they worked on the strongback and the A-sling under the supervision of Mayo, Beloit's engineer.
The wire carriage, including the A-sling, was given a trial run the day before the accident. The weight lifted was 600 to 800 pounds, while the wire carriage for which the A-sling was designed and which fell the following day weighed approximately 2,000 pounds. After the test run and before the accident, no further tests or inspections were made of the clamps, cables, turnbuckle or strongback. On the day of the accident the moving of the wire carriage was delayed until the Beloit representatives, Cobb and Mayo, returned from lunch. The wire carriage was being slowly lowered when the wire cable slipped out of the clamps by the turnbuckle, causing the wire carriage assembly to collapse, killing McComish and injuring Toman.
Henry J. DeSoi, Whippany's general superintendent, stated in his deposition, read at the trial, that the wire carriage was "installed by Brennan under Beloit's supervision. Like anything else on the machine," and "* * * it was Brennan's Company's responsibilities, obligation under Beloit's guidance."
Eugene J. Burner, an industrial safety field inspector and supervisor for the New Jersey Department of Labor and Industry, testified that the construction of the A-sling was clearly improper because at least three clamps, instead of two, should have been used to secure the cable to the strongback. These clamps should have been spread at least six diameters apart. In addition, Burner noted that 5/8-inch wire cable was used with 3/4-inch clamps. This 5/8-inch cable did not comply with the blue print, which called for 3/4-inch. Burner testified that the use of a smaller cable was "contrary to safe practice," because "if you use an oversize clamp on a rope you have a margin of safety there which is ignored."
Plaintiff's expert witness, Isaac Stewart, a licensed professional engineer, personally inspected the wire cable, sling, *513 turnbuckle and cable clamps. He noted that the cable was too small for the "oversized clips." In reply to a hypothetical question he expressed his opinion that:
"This accident was directly caused by the improper manner of construction of the sling, particularly, with regard to the clips that were used and the insufficient number that was used and thereby permitting the sling to slip, come apart under the load that it was ostensibly designed to withstand. The lack of testing prior to its use was one serious fault. The fact that no clips were tightened after the first load that had been lifted was a second serious fault. Certainly, the spacing of the clips were improper * * *."
It is axiomatic that defendants' liability is required to be predicated upon an antecedent duty to the plaintiff. McKinley v. Slenderella Systems of Camden, 63 N.J. Super. 571, 580 (App. Div. 1960). The existence of this duty is a question of law to be declared by the court; defendants' failure to meet that duty is a question of fact for the jury. Morril v. Morril, 104 N.J.L. 557, 561 (E. & A. 1928); Mergel v. Colgate-Palmolive-Peet Co., 41 N.J. Super. 372, 379 (App. Div. 1956), certification denied 22 N.J. 453 (1956); 2 Harper and James, The Law of Torts (1956), § 8.18, pp. 1058 et seq.; Prosser, The Law of Torts (2d ed. 1955), § 39, p. 192.
Beloit and Brennan were both independent contractors, for they contracted directly with the owner of the property for the work to be performed. Their relationship is to be distinguished from the subcontractor relationship in which one contracts for the performance of an act with the person who already has a contract for its performance. Cf. Brygidyr v. Rieman, 31 N.J. Super. 450, 453-454 (App. Div. 1954); Mittan v. O'Rourke, 115 N.J.L. 177, 179 (Sup. Ct. 1935).
An independent contractor's responsibility evolves from the authority or control over the instrumentality which is the proximate cause of injury to third persons. The question of control is a factual issue to be resolved by the jury, Meny v. Carlson, 6 N.J. 82, 94 (1950); Hardman v. Ford Motor Co., 70 N.J. Super. 275, 290 (App. Div. 1961), certification *514 denied 36 N.J. 299 (1962), and is to be determined from all the facts and circumstances surrounding the relationship, including the contracts between the parties. Trecartin v. Mahony-Troast Construction Co., 18 N.J. Super. 380, 391 (App. Div. 1952).
In reviewing the relevant relationships between the parties on their respective motions for judgment and judgment notwithstanding the verdict, appellate review is limited by the standards succinctly stated in Kopec v. Kakowski, 34 N.J. 243, 244 (1961). There the court stated that the trial judge may grant a motion for judgment only when he can conclude that fair-minded men cannot honestly differ as to the conclusions to be drawn from the proofs. The trial judge cannot weigh the evidence but must accept as true all evidence together with all legitimate inferences which support the views of the party against whom the motion is made. See Melone v. Jersey Central Power & Light Co., 18 N.J. 163, 170 (1955).
A review of the proofs convinces us that the question of Beloit's control over the design, manufacture and installation of the fatally defective A-sling was properly presented to the jury. The A-sling was an integral part of the basic paper-making machine built by Beloit. Beloit's engineer, Mayo, described himself as the supervisor. He was generally acknowledged by his co-workers as supervising and directing the operations. The two Whippany employees, Moll and Opanowitz, testified that the A-sling was constructed under Mayo's supervision. The A-sling was designed by Cobb, another Beloit engineer. The use of the wire carriage on the day of the accident was delayed until Mayo and Cobb returned from lunch. Furthermore, Whippany's general superintendent stated that Beloit supervised the project.
On the other hand, the evidence is clear that Brennan had nothing whatever to do with the design, construction or installation of those parts of the A-sling which caused the accident. Although the contract with Whippany states that Brennan was to furnish all labor and supervision necessary *515 for the installation of the machinery, it also states that Brennan would be subordinate to Beloit supervisors. While Brennan's superintendent, Schultz, stated that his employees bolted on the end plates after the A-sling was attached to the strongback, there was no relation between this work and the fatally defective cable and clamps. Even assuming that Schultz did make the penciled notations on the revised plan before the occurrence of the accident, there is no evidence that Brennan had the degree of control necessary to charge it with a duty to inspect and test the A-sling. As we have said, Brennan did not build the A-sling, nor did it furnish any of the materials. Indeed, the evidence overwhelmingly demonstrates that Beloit had full control and supervision over the design, construction, testing and inspection of the A-sling. Brennan's motions to dismiss and for judgment notwithstanding the verdict were, therefore, improperly denied.
Both defendants claim that reversible error was committed when the trial judge admitted, as part of plaintiffs' case, portions of five safety manuals concerning wire rope cables and clamps. These codes were published by four governmental agencies and a wire rope manufacturer. The excerpts marked in evidence specified that three or four clamps should have been used on the wire rope sling  instead of the two clamps actually used.
This State has long adhered to the principle that the contents of treatises or books of science are inadmissible in evidence; but, if a witness relies upon them or admits their authoritative nature, statements from such treatises or books may be read on cross-examination for the purpose of contradicting the witness or calling into question the weight to be attached to his opinion. Ruth v. Fenchel, 21 N.J. 171, 176-179 (1956), affirming 37 N.J. Super. 295 (App. Div. 1955); New Jersey Zinc & Iron Co. v. Lehigh Zinc & Iron Co., 59 N.J.L. 189, 192 (E. & A. 1896). See generally, McCormick, Evidence (1954), § 296, p. 620. Plaintiffs attempt to give retroactive sanction to the direct introduction in evidence of the safety manuals by emphasizing that Stewart referred to *516 the manuals both on direct and cross-examination and that defendants' expert witness, Dr. Norman E. Woldman, recognized the manuals on cross-examination as authoritative works in the field. This argument overlooks the fact that the manuals were introduced as evidence on direct examination  before cross-examination of Stewart and before the cross-examination of Woldman. They were improperly offered, not to affect the credibility of the witness, but to prove their contents as fact. Even if selections from the works are properly read during cross-examination, "the work itself is not to be admitted in evidence." Ruth v. Fenchel, supra, 21 N.J., at p. 179. But see Report of the Committee on Revision of the Law of Evidence (1955), Rule 63 (31), p. 165.
Plaintiffs call our attention to R.R. 4:45-1 and the decision of Cox v. Wall Tp., 39 N.J. Super. 243, 248-249 (App. Div. 1956). R.R. 4:45-1 provides in pertinent part that:
"An official record or an entry therein, when admissible for any purpose, may be evidenced:
(a) By a document purporting to be an official publication thereof * * *." (Emphasis added)
As the emphasized portion above states, the rule merely governs the procedure by which official records may be received in evidence; the rule itself does not provide for their automatic admissibility. "The fact that it is an official record does not mean that matters of opinion and conclusion contained therein are admissible in evidence." 5 Moore's Federal Practice, § 44.02, p. 1515, n. 2 (Supp. 1961, at p. 82). That portion of the decision in Cox v. Wall Tp., supra, concerning the admission of certain official records  although admittedly cryptic  merely permitted the admission of the exhibits "as official records, evidenced by a document purporting to be an official publication." 39 N.J. Super., at p. 249. The official records in that case must have had an independent ground for their admissibility.
*517 An error in the admission of evidence will justify a new trial where that error is clearly prejudicial to substantial rights and therefore inconsistent with substantial justice. R.R. 1:5-3(b). See Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295, 308 (1954). In the present case, the introduction of the safety codes requires a new trial as to Beloit because the evidence contained therein was not cumulative. Plaintiff's expert witness, Stewart, based his opinion directly upon these materials and had never made an independent evaluation of the problem presented by the proper relation of the clamps to the cable. Additionally, the fact that four of the five manuals bore the imprint of the United States Government added apparent authority to their contents and made their introduction extremely prejudicial.
In view of our determination, we need not consider the correctness of the court's charge to the jury that Brennan had the duty of a manufacturer. Since a new trial will be required as to Beloit, there is no need to consider the question of damages on this appeal.
Accordingly, the cause of action against Brennan is dismissed. The judgment against Beloit is reversed and that action is remanded for a new trial.