LAVINA MAE McCOMISH, ADMINISTRATRIX *AD PROSE-QUENDUM* OF THE ESTATE OF ROBERT G. McCOMISH, DECEASED, PLAINTIFF-APPELLANT, v. HARRY L. DeSOI, *ET AL.*, DEFENDANTS, AND BRENNAN COMPANY, INC., ETC., DEFENDANT-RESPONDENT, AND BELOIT IRON WORKS, ETC., DEFENDANT-RESPONDENT AND CROSS-APPELLANT.

ROBERT R. TOMAN, PLAINTIFF-APPELLANT, v. HARRY L. DeSOI, *ET AL.*, DEFENDANTS, AND BRENNAN COMPANY, INC., ETC., DEFENDANT-RESPONDENT, AND BELOIT IRON WORKS, ETC., DEFENDANT-RESPONDENT AND CROSS-APPELLANT.

Argued February 18, 1964—Decided May 4, 1964.

*Mr. Morris M. Schnitzer* argued the cause for plaintiffs-appellants, Lavina Mae McComish and Robert R. Toman (*Mr. Waldron Kraemer,* on the brief; *Mr. Fred Freeman,* attorney).

*Mr. Robert J. C. McCoid* argued the cause for defendant-respondent and cross-appellant, Beloit Iron Works (*Messrs. Schneider, Lustbader & Morgan,* attorneys).

*Mr. Clifford W. Starrett* argued the cause for defendant-respondent Brennan Company, Inc. (*Messrs. Schenck, Smith & King,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. This is a negligence action arising out of an industrial accident which occurred June 22, 1958 on premises of the Whippany Paper Board Company (Whippany) at Whippany, New Jersey. The mishap resulted in the death of

Robert McComish and personal injuries to Robert Toman. Both men were employees of Whippany.

Beloit Iron Works built a huge paper-making machine for Whippany under contract. The machine, built at the Beloit plant in Wisconsin, was approximately 700 feet long and two stories high. After construction it was match-marked, disassembled and shipped to Whippany for reassembly and installation. Beloit provided its engineers at the Whippany plant during the operation there. Whippany contracted with Brennan Company, Inc., a rigger, to install the machine. Among other things the agreement provided:

"This contractor will be subordinate to the manufacturer's supervisors in all matters concerning method of assembly, preparation of components, alignment, and all else pertaining to the proper installation of the machinery."

An integral part of the mechanism was a portable wire screen, weighing approximately a ton, which had to be moved from one section of the machine to another during the paper-making process. As originally designed by Beloit, the screen was to be shifted by a wire carriage which would be raised and lowered by means of two vertical wire cables. A construction feature of the building made use of this device impossible. Thereupon, a Beloit engineer designed an "A" sling to accomplish the purpose. The top of the A sling was a steel ring about 8 inches in diameter which was to be placed on an overhead crane hook. The sides of the A were of wire cable 8 feet long attached to a horizontal spreader bar ("strong back"), a steel "I beam" about 22 feet long. The cables were attached about 4 feet from the ends of the strong back, the ends of the cable being secured by two Crosby clips.

Testimony disclosed that the sketch was given to two Whippany structural iron workers who constructed the A sling under the supervision of a Beloit engineer. In doing so, by mistake, they used ⅝ inch cable for the sides instead of ¾ inch. Then in securing each end of the cable they used two ¾ inch Crosby clamps.

On the day of the accident the wire carriage was being moved by means of the A sling and crane when one side of the wire cable slipped out of the ¾ inch Crosby clamps causing the assembly to collapse and the carriage to fall, killing McComish and injuring Toman.

Suit for damages was brought against Beloit, Brennan and several employees of Whippany by Lavina Mae McComish, administratrix *ad prosequendum* of Robert A. McComish, and by Toman. Trial resulted in judgments for the administratrix in the amount of $160,000 and for Toman of $16,500. The action against the Whippany employees was dismissed by the trial court.

Defendants appealed to the Appellate Division alleging a number of trial errors. Primarily, they raised issues as to the sufficiency of plaintiffs' proof of negligence on the part of the defendants, admissibility of certain manuals relating to the safety standards said to be applicable to the construction of the type A sling involved here, propriety of the charge to the jury as to Brennan, and whether the McComish verdict was excessive. The Appellate Division concluded the evidence of Brennan's alleged negligence was inadequate to justify sending the issue to the jury for determination, and that Brennan's motion to dismiss at the close of plaintiffs' case, and for judgment at the end of the entire case, should have been granted. Consequently, the judgment against Brennan was reversed. With respect to Beloit, however, the court held that the evidence of negligence was sufficient to require submission of the issue to the jury for decision. It decided also that the McComish verdict was not excessive. But it held the safety manuals or codes should not have been received in evidence, and that the error was so prejudicial as to require a new trial as to defendant Beloit. Plaintiffs and defendant Beloit cross-petitioned for certification. We granted both petitions. 41 *N. J.* 122 (1963).

Our study of the record satisfies us that the Appellate Division was correct in reversing the judgment against Brennan, in sustaining the trial court in sending the question of Beloit's

negligence to the jury, and in holding the McComish verdict not to be excessive. On those aspects of the appeal we affirm substantially for the reasons expressed in its opinion. 83 *N. J. Super.* 505, 200 *A. 2d* 511 (*App. Div.* 1963). For reasons to be stated, however, we cannot agree that the trial court erred in admitting the safety codes.

Plaintiffs called one Isaac Stewart, a consulting engineer of this State as an expert witness. His testimony revealed considerable educational and practical experience as a metallurgical and physical test engineer. His training had included study and experience in testing and inspecting wire cable, cable clamps and in the construction or assembly of wire rope slings. No challenge was interposed at the trial to his qualifications to advance an expert opinion in the field covered by his testimony.

Some time after the accident Stewart examined and studied the A sling at the Hanover Township Police Headquarters where it had been taken. From this study he concluded, and so testified, that the use of $3/4$ inch Crosby clips to secure $5/8$ inch wire cable in the A sling assembly was improper, dangerous and a deviation from generally accepted safety practices in the industry. Further he said that not only were the clips over-sized, but they were improperly spaced on the cable, and an insufficient number had been used. In his opinion, under accepted safety practice in the industry, at least three proper sized clips were required and they should have been spaced on the cable a distance represented by six times the diameter of the cable.

On direct examination of Stewart additional inquiry was made as to whether there were any "standards in the trade and safe practice standards" or "standard and safe practices." He replied that there were, and mentioned the following recognized manuals or codes specifying standard or prevailing safety practices in the field under discussion: American Tiger Brand Wire Rope, United States Steel, United States Army Corps of Engineers, United States Navy Safety Precautions,

United States Air Force Manual and United States Army Harbor Craft Crewman's Handbook.

These manuals contained the following requirements for number and size of clips to be used in assemblies like A slings in connection with ⅝ inch cable:

| Manual | Size of Cable | Size of Clip | Number of Clips |
|---|---|---|---|
| American Tiger Wire Rope | ⅝" | 9/16" | 3 |
| U. S. Army Corps of Engineers | ⅝" | ⅝" | 4 |
| U. S. Navy Safety Precautions | ⅝" | ⅝" | 4 |
| U. S. Air Force | Smaller than ¾" | | 4 |
| Harbor Craft Crewman's Handbook | Smaller than ¾" | | 4 |

All of the manuals, except the Harbor Craft Crewman's which contains no reference to the matter, prescribe that the clips should be spaced six rope diameters apart. Defendants objected to the reference to these manuals and to their admission in evidence on the ground that they were hearsay. The trial court overruled the objection.

In connection with the consideration of this evidence problem, some further testimony should be noted.

Plaintiffs also called as a witness Eugene J. Burner for many years field inspector and later supervisor of industrial safety of the Department of Labor and Industry of the State of New Jersey. It was part of his work to inspect lifting devices and wire ropes and clamps used with such devices. He was familiar with rules and regulations of safety codes relating to the use of such assemblies. He was assigned by the Department to investigate this accident, and in the course of doing so, examined the A sling, cable and clamps. From the study he concluded that it was contrary to safe practice to use ¾ inch clamps on ⅝ inch rope; also that three proper sized clamps instead of two clamps should be spaced apart the distance of at least six diameters the size of the cable. Without objection from anyone, he testified that his opinion as to safe practice was in accord with the American General Con-

tractors Safety Specifications, and the safe practice code of the National Safety Council and the American Standards Association.

Defendants produced Dr. Norman E. Woldman who holds a doctorate in engineering from Columbia University, had taught at the Universities of Maine and Illinois, the United States Naval Academy, the Carnegie Institute of Technology and at Stevens Institute of Technology, and was permanently employed as a consulting engineer by seven large manufacturing companies. In the course of cross-examination he said he recognized the American Tiger Brand Wire Rope, United States Navy Safety Precautions and United States Air Force manuals as authorities on safety precautions and on wire rope cables and clamps. Defendants offered no objection to these statements.

In holding that the safety codes referred to were hearsay and inadmissible, the Appellate Division seems to have believed they were offered as learned treatises or scientific works. On that assumption they were rejected under the long-established rule in New Jersey which was expressed by this Court in *Ruth v. Fenchel*, 21 N. J. 171, 176 (1956), as follows:

"Where the contents of a treatise is offered as substantive evidence in the case, the general rule has been to deny admission principally upon the ground that the offer of the contents in evidence purports to employ testimonially a statement out of court by a person not subjected to cross-examination."

More particularly, under our cases learned treatises have been declared inadmissible to prove the opinion contained in them. If a witness refers to them as authority, statements may be read therefrom for the purpose of contradicting him. Furthermore, inquiry may be made on cross-examination as to whether he recognizes other books as standard authorities, and if he concedes the fact he may be confronted with conflicting statements appearing therein. But in neither case may the work itself be received in evidence. *Id.*, at *pp.* 178, 179. We

have been asked to re-examine our rule with respect to admissibility of learned treatises in the light of the Appellate Division opinion. It is not necessary to do so for we are satisfied that the doctrine is neither applicable nor controlling in the present case.

█ █ In this case, however, the manuals were not received as learned treatises. They were introduced as safety codes, as objective standards of safe construction, generally recognized and accepted as such in the type of construction industry involved. A treatise is usually no more than one expert's opinion regarding a particular factual complex. On the other hand, a safety code ordinarily represents a consensus of opinion carrying the approval of a significant segment of an industry. Such a code is not introduced as substantive law, as proof of regulations or absolute standards having the force of law or of scientific truth. It is offered in connection with expert testimony which identifies it as illustrative evidence of safety practices or rules generally prevailing in the industry, and as such it provides support for the opinion of the expert concerning the proper standard of care.

█ █ The basic test as to the responsibility of Beloit here is whether reasonable care was exercised in the construction and assembly of the A sling. That is the standard to be used and departure or deviation therefrom is negligence. In applying the standard reasonable men recognize that what is usually done may be evidence of what ought to be done. And so the law permits the methods, practices or rules experienced men generally accept and follow to be shown as an aid to the jury in comparing the conduct of the alleged tortfeasor with the required norm of reasonable prudence. It is not suggested that the safety practices are of themselves the absolute measure of due care. They are simply evidence of "how to" assemble the sling as commonly practiced by those who have experience in doing it. It is important that their limited function and probative force as evidence be appreciated. What ought to be done is fixed by the standard of reasonable prudence, and in law that requirement remains the same whether it is

usually complied with or not. Thus, what is usually done in a particular industry cannot be regarded as what ought to be done unless the conduct and the test are in harmony.

We have no case in New Jersey where the precise issue before us has been considered. There is no doubt that in some jurisdictions safety codes have been excluded as hearsay. Annotation, 75 *A. L. R. 2d* 778 (1961). But in others they have been admitted after proper identification by a qualified witness for the purpose alluded to above, *i. e.,* as some evidence of the proper standard of care but not as absolute evidence of such standard.

In *Sage v. Northern Pac. Ry. Co.,* 62 *Wash. 2d* 6, 380 *P. 2d* 856 (*Sup. Ct.* 1963), approval was given to admission in evidence of the booklet of the National Safety Council concerning safety standards relating to the carriage of loose equipment in vehicles such as a carry-all.

*Smith v. Iowa Public Service Co.,* 233 *Ia.* 336, 6 *N. W. 2d* 123 (*Sup. Ct.* 1942), approved the receipt in evidence of the National Safety Code, a set of rules drawn up by the Bureau of Standards, a division of the United States Department of Commerce. The code had no legislative sanction but the testimony showed it was commonly accepted as a norm of construction. The court regarded it as evidence of a standard of care. A portion of the same code relating to the method of construction of high voltage lines was admitted in *Rudd v. Public Service Co.,* 126 *F. Supp.* 722 (*N. D. Okl.* 1954). It was said to provide a reasonable guide in measuring due care.

Specifications or codes of the Association of American Railroads which the testimony indicated were customarily followed by railroads were ruled acceptable in evidence to show the system of signals used for the operation of trains (*Rouse v. New York C. & St. L. R. R.,* 349 *Ill. App.* 139, 110 *N. E. 2d* 266 (*App. Ct.* 1953)), and to show the method of loading cars. *Blytheville Cotton Oil Co. v. Kurn,* 155 *F. 2d* 467 (6 *Cir.* 1946) ("In no case should the skids supporting machinery be fastened to the car floor.") (*Modern Tool Corp. v. Pennsylvania R. R.,* 100 *F. Supp.* 595 (*D. N. J.* 1951);

*Reed v. Missouri-Kansas-Texas R. R.*, 362 *Mo.* 1, 239 *S. W. 2d* 328 (*Sup. Ct.* 1951)). Rules of the Master Car Builders Association were admitted as evidence of proper construction of a railroad car, *Leas v. Continental Fruit Express*, 45 *Tex. Civ. App.* 162, 99 *S. W.* 859 (*Civ. App.* 1907), but could not show as a matter of law that such construction was not negligent. *Continental Fruit Express v. Leas*, 50 *Tex. Civ. App.* 584, 110 *S. W.* 129 (*Civ. App.* 1908).

In *Alabama Power Co. v. McIntosh*, 219 *Ala.* 546, 122 *So.* 677 (*Sup. Ct.* 1929), an employee of a floor cleaner and waxer was working around a floor electric connection in the power company's building. He was using gasoline and steel wool for cleaning purposes when a flash came from the floor socket causing gasoline to ignite. The fire spread and resulted in the employee's death. In a subsequent death action against the company, evidence was adduced to prove that the National Electrical Code was the standard used by all competent wiremen; it was called the "interior wireman's Bible" by one witness. It was allowed to be used to demonstrate that defendant's electrical fixture was not the proper type for use in floors. The court said: "[t]he Code, being the expression of the matured judgment and experience of men in that business, becomes evidence of correct appliances for such places, and evidence that the use of fixtures forbidden by it is negligence." *Id.*, 122 *So.*, at *p.* 680.

*Clark v. Zuzich Truck Lines*, 344 *S. W. 2d* 304 (*Mo. Ct. App.* 1961), involved the breakage of a ball stud in the steering mechanism of a tractor. Testimony was admitted that the method of construction of the mechanism differed from that recommended in the Standard Automobile Engineers Handbook. The method outlined in the book was held to be evidence of the standard of care.

The Seventh Circuit Court of Appeals in *Moschkau v. Sears, Roebuck & Co.*, 282 *F. 2d* 878 (7 *Cir.* 1960), rejected a claim that the trial court erred in allowing testimony that the warning on the label of plastic laminate adhesive conformed to that specified by the National Fire Protection or-

ganization and by the New York Fire Department. Those regulations were said to be evidence of usual standards. In another labeling case, *Tampa Drug Co. v. Wait,* 103 *So. 2d* 603, 75 *A. L. R. 2d* 765 (*Fla. Sup. Ct.* 1958), the trial judge permitted in evidence labels promulgated for the use of the chemical industry by the Labeling Committee of the Manufacturing Chemists Association, an organization numbering among its membership many of the major chemical manufacturing concerns in the United States. In rejecting the claim of error, the Supreme Court said:

"The labels were not allowed in evidence to establish a conclusive standard of care. They were submitted to the jury along with all of the other evidence as a basis for comparing appellant's label with others, merely as a guide to a determination of the adequacy of the warning furnished by appellant. For this purpose we have the view that they were properly allowed in evidence." *Id.,* at *p.* 610.

Safety codes of the kind being discussed have been held admissible at the offer of the defendant as well as the plaintiff. They were received as evidence that defendant adhered to the practice approved and followed in the industry. For example, proof that an electric company erected its lines at a height which complied with the minimum standards of the National Electrical Safety Code is a factor which may be considered by the jury on the issue of negligence, although not in itself an absolute defense. *Florida Power Corp. v. Willis,* 112 *So. 2d* 15 (*Fla. Ct. App.* 1959).

■■ Criticism has been leveled in this case not only against the competency of the codes but against the introduction of the documents as well. This secondary problem is one which must be left largely to the discretion of the trial court. Whether the entire code or just the pertinent portion should go to the jury (removed from the document, or copied or photostated), or whether the pertinent portion should simply be read to the jury, must remain in his hands, and an appellate tribunal will not interfere unless abuse of discretion is manifest. Undoubtedly, where the adversary party has no

advance notice that codes are to be relied upon, he should be allowed adequate time at the trial for examination of the documents to ascertain if they contain any modifications or qualifications or explanations of the excerpts sought to be introduced. If so, the additional material must be admitted when offered. Moreover, if the examination reveals unrelated but prejudicial matter, care should be exercised to exclude it. We have perused the entire codes with these various problems in mind and cannot say the trial judge erred in marking them in evidence.

Our analysis of the arguments for and against the evidentiary competency of safety codes or manuals such as those involved here has led us to conclude that they were pertinent and valuable aids in the resolution of the issue of negligence of the defendants. Although the precedents are in conflict, in our judgment the exclusionary view is unrealistic. Accordingly, the judgment of the Appellate Division ordering a new trial for the defendant Beloit is reversed, and the judgments of the trial court in favor of the plaintiffs and against Beloit are affirmed. Further, the judgment of the Appellate Division in favor of the defendant Brennan is affirmed.

*Affirmed in part and reversed in part* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*Opposed*—None.