108 N.J. Super. 120 (1969)
260 A.2d 240
DEBRA JANE SWANK, AN INFANT BY HER GUARDIAN AD LITEM, DALE SWANK, AND DALE SWANK, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
ELETHERIOS HALIVOPOULOS, M.D., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 24, 1969.
Decided December 29, 1969.
*122 Before Judges KILKENNY, LABRECQUE and LEONARD.
Mr. Mark D. Larner argued the cause for appellants (Messrs. Budd, Larner, Kent & Gross, attorneys).
Mr. Raymond M. Tierney argued the cause for respondent (Messrs. Shanley & Fisher, attorneys; Mr. A. Dennis Terrell, On the Brief).
The opinion of the court was delivered by LEONARD, J.A.D.
In this pediatric malpractice case plaintiffs appeal from a judgment in favor of defendant following a jury verdict of no cause for action, and from the trial court's order denying plaintiffs a new trial.
It is not disputed that the infant plaintiff, a premature baby, developed retrolental fibroplasia which caused complete and permanent blindness. Plaintiffs assert that this condition was caused by the excessive administration of oxygen at birth and for the following six days.
The infant was born on September 19, 1964 at the Perth Amboy General Hospital at or about 7:40 P.M. At birth *123 the baby weighed 2 lbs. 14 oz. and was the result of a premature 27-week pregnancy. (A normal pregnancy is 40 weeks.) The birth was complicated by a placenta abruptus (a premature separation of the placenta from the uterine wall). Further, the birth was a breech delivery with the baby appearing feet first.
The child had been delivered by an obstetrician who promptly placed her in an isolette with oxygen below 40% concentration. Thereupon defendant, who specializes in pediatrics, was called by the obstetrician. Upon being notified of the call by his answering service, defendant telephoned the hospital and was told of the complications of the birth and delivery, the other relevant factors, and that the baby was then being kept in an isolette with oxygen. He directed that the administration of oxygen below 40% be continued. The next morning defendant examined the baby while she was in the isolette and thereafter examined her daily for the next six days. Pursuant to his orders oxygen, below 40%, was administered to the child continuously from September 20 until September 24. On September 25 defendant ordered oxygen to be administered on a "PRN" (as necessary) basis, and it was gradually discontinued on that day. None was given on September 26 or thereafter.
Plaintiffs offered as a witness Dr. Henry Gaynin, an ophthalmologist licensed to practice medicine in New York. He was not a pediatrician but a physician whose specialty involved the treatment and correction of existing eye conditions. He testified that he examined the infant plaintiff in his office on February 11, 1966 and at the St. Clare's Hospital, New York, on April 1, 1968. He diagnosed her condition as retrolental fibroplasia resulting from oxygen and causing the permanent loss of sight. Based upon his review of the records of the Perth Amboy Hospital, the doctor stated that defendant administered an excess amount of oxygen to the infant. He opined that the amount of oxygen administered by defendant for the number of days that it *124 was given was a deviation from the requirements of accepted medical standards.
At the trial defendant did not dispute Dr. Gaynin's diagnosis of the infant's eye condition nor the fact that as a result thereof she was totally and permanently blind. Defendant, without admitting that the oxygen administered pursuant to his orders caused the eye condition, did concede that it "might" be the cause. He testified that even though he recognized that retrolental fibroplasia is one of the known possible dangers resulting from the use of oxygen for prematurely born babies, he nevertheless ordered its administration in the amount and for the time he did because he felt that "the baby couldn't survive without it" and that "oxygen was a mandatory thing for this particular baby." He added that "I was trying to save the baby's life and that was my main concern." He concluded that under the existing circumstances his conduct in the administration of the oxygen comported with existing accepted medical practice.
Dr. Louis Krafchik, a certified diplomate of the American Board of Pediatrics and chief of pediatrics at both St. Peter's Hospital and Middlesex General Hospital, New Brunswick, was called as a witness by defendant. He had reviewed the infant's hospital record and based thereon concluded that under the conditions then existing defendant's care of the infant, particularly as to the oxygen administered, was in accord with accepted medical practice and there was no deviation therefrom. He stated that it was also his opinion that a "baby's [situated as was the infant plaintiff] outlook is very, very grave and the baby cannot survive without oxygen."
Plaintiffs first contend that the trial court improperly limited cross-examination of defendant and his expert with reference to a certain book known as Dunham's Premature Infants by a Dr. William Silverman. When queried about this text on cross-examination defendant replied "I'm not familiar with it." He further testified that he had neither seen nor heard of this text. No further reference to this book *125 was made during the cross-examination of defendant, and the record fails to disclose that the trial court limited the cross-interrogation of defendant with reference to it.
When defendant's expert was asked on cross-examination about the book, he replied that "I don't know the book" and further, that he was not familiar with its authoritative nature. At this point counsel for plaintiffs requested an opportunity to make an offer of proof. Pursuant to the granting of this request, counsel, out of the presence of the jury, stated that he desired to qualify the book as authoritative through his own medical expert, Dr. Gaynin, so that he could (1) cross-examine defendant and his expert as to specific portions thereof, and (2) comment to the jury that defendant and his expert witness were unfamiliar with a basic and authoritative work in the field. The trial court sustained defendant's objection to this proffer "until a foundation is laid." Plaintiffs now argue that the credibility of an expert should be subject to attack by use of a treatise the authoritative status of which is established by any acceptable manner. This argument is in conflict with the existing law of this State. Here, an expert may be cross-examined upon a treatise only if he "admits that the treatise is a recognized and standard authority on the subject." Ruth v. Fenchel, 21 N.J. 171, 176 (1956). It is only then that the contents of the book may be read for the purpose of contradicting or discrediting the witness. Id., at 178, 179. Nor can the contents be received as substantive evidence in the case. Id., at 176. Proposed Evidence Rule 63 (31), "Learned Treatises," has not been adopted in this State. Since neither defendant nor his expert witness recognized Dunham's Premature Infants as an authority on the subject here involved, the trial court properly prohibited plaintiffs' contemplated use thereof.
Plaintiffs next contend that the "Standards and Recommendations of the American Academy of Pediatrics" (hereafter Academy Standards), as set forth in the appendix of Dunham's Premature Infants, should have been admitted *126 as evidence of the applicable standard of care for the administration of oxygen to prematures. Plaintiffs concede that since Evidence Rule 63 (31) was not adopted in this State, the offered document was not admissible as a learned treatise. However, he first argues that it was admissible "as objective standards generally recognized and accepted because representative of a consensus of opinion approved by the profession." Thus, he contends the publication is similar to "safety codes" held admissible in McComish v. DeSoi, 42 N.J. 274 (1964). However,
* * * such a code is not to be introduced as substantive law, as proof of regulations or absolute standards having the force of law or of scientific truth. It is offered in connection with expert testimony which identifies it as illustrative evidence of safety practices or rules generally prevailing in the industry, and as such it provides support for the opinion of the expert concerning the proper standard of care. [Id., at 282].
Further, these industrial codes are readily distinguishable from the Academy Standards. The former contains specific directions of the "how to" perform certain mechanical operations, the methods of construction to be followed and the type of material to be used. (In McComish the code was admitted to show the number and size of clips to be used in assemblies like "A" slings in connection with 5/8 inch cable.) As to the administration of oxygen to premature babies, the only specific direction contained in the Academy Standards was that oxygen should not be normally given in concentrations of more than 40%. (It is conceded that the concentration of the oxygen administered was below 40%.) Beyond this, it made only general "recommendations" as to oxygen and left the final determination with respect to its use to the clinical judgment of the attending physician. For these reasons, we conclude that the Academy Standards cannot be equated with an industrial code and that plaintiffs' present argument lacks merit.
Additionally, releases of the New Jersey Department of Health concerning the administration of oxygen to premature *127 babies were introduced into evidence by plaintiff without objection and were available to his expert. These exhibits contained substantially the same general information and recommendations as contained in the Academy Standards. Thus, plaintiffs were not prejudiced by the exclusion of the latter.
Plaintiffs also argue that the Academy Standards were admissible in evidence because they are comparable to manufacturer's brochures which accompany a drug and thereby are admissible as independent evidence of the applicable medical standards. This point was not argued below and is now raised for the first time. These recommendations cannot be compared to drug brochures which set forth the dosage or procedures to be rigidly followed in all cases. To the contrary, the former, as noted above, contain only general recommendations, leaving the final determination under the existing conditions to the physician. Additionally, the law of this State presently does not allow the use of standards as independent evidence. McComish v. DeSoi, supra, 42 N.J., at 282; Ruth v. Fenchel, supra, 21 N.J., at 176. For these reasons, we find that this argument is without merit.
Plaintiffs next assert that the trial court committed plain error in failing to instruct the jury that the purpose of the introduction of the Department of Health publication was as "additional and independent support for the [their] expert's opinion." No request was made for such an instruction and plaintiffs did not object to the charge as made on this ground. The receipt of this material into evidence without such a cautionary charge as is now suggested, left the jury in a position where it could generally consider the exhibit; possibly, even as independent evidence of the applicable standard of care. Thus, the cautionary charge would have protected defendant, not plaintiffs. Under these circumstances, plaintiffs were not prejudiced by the court's failure to make the suggested charge and we find no plain error.
Plaintiffs next complain that the trial court erroneously instructed the jury that they had a double burden *128 of proof, namely, to prove that "the defendant deviated from a standard of care and also that he was otherwise negligent." Plaintiffs base this contention on the following language in the charge:
If you find from the evidence that there was a deviation from such standard medical practice, you must then determine from the evidence if such deviation constituted negligence on the part of Dr. Halevopoulos; * * *
However, this is only a part of a sentence which continues on as follows:
* * * that is, whether the doctor failed to use, in the circumstances of the case, that degree of knowledge, skill and care ordinarily possessed and exercised by the average member of his profession practicing his specialty in the diagnosis, care and treatment of his patient.
Again, plaintiffs did not object to the court's charge on this ground and did not urge this issue on their motion for a new trial. Considering the charge as a whole, it is clear that the court on numerous occasions properly explained plaintiffs' burden of proof under the existing evidence and that the jury understood these instructions. Cf. Cross v. Robert E. Lamb, Inc., 60 N.J. Super. 53, 64-65 (App. Div. 1960), certif. den. 32 N.J. 350 (1960). From a reading of the entire charge it is apparent that the court, in referring to "a deviation from such medical practice" at the point presently referred to by appellants, was speaking of the standard of care applicable to defendant's conduct, by which the jury was to determine whether he had been negligent. Thus, we find no plain error.
Finally, plaintiffs allege that the verdict was against the weight of the evidence. Defendant and his expert, both pediatricians, testified as to the correctness of the procedure followed by defendant. Plaintiffs' expert, an ophthalmologist, testified that defendant violated the existing medical standard. The issue of liability was thoroughly presented and argued *129 by both sides. The case could have gone either way. The jury resolved the conflict of evidence in favor of defendant and their verdict is more than reasonably supported by the credible evidence. Consequently, we will not disturb it.
Judgment affirmed.